Case number 25-5054, Servier Pharmaceuticals LLC, at balance, v. Robert F. Kennedy, Jr., in his official capacity as Secretary of Health and Human Services, amendment of, in his official capacity as Secretary for the Centers for Medicare and Medicaid Services. Mr. Perdue, for the balance. Mr. Janda, for the release. Good morning, counsel. Morning, your honors, and may it please the court. William Perdue, on behalf of Servier Pharmaceuticals LLC, I'd like to reserve three minutes for rebuttal. Because the government has abandoned one of the two grounds for the decision below, this appeal comes down to a single question, whether the 2021 expenditures for TIPSOVO count towards, quote, the total expenditures under Part D for any one of the specified small manufacturer drugs of Servier. The answer to that question is yes, for three independent reasons. First, Servier undisputedly manufactured TIPSOVO in 2021, and the statutory analysis is product by product, not unit by unit. Second, even if the analysis were unit by unit, Servier, as the NDA holder, was legally responsible for every unit of TIPSOVO that was sold after April 1, 2021. And third, even if the NDA alone were not enough, CMS never explained its exclusive reliance on labeler codes. And on remand to the agency, Servier can present evidence of packaging and quality control activities that would satisfy even the most stringent reading of the statute. I'd like to start with our argument that the analysis is product by product, rather than unit by unit. I'm just asking one thing, in a post-liberal right world, why does it matter that the government is no longer arguing for one interpretation of the statute? I assume you're referring to the- The district court actually ruled on, so we have that now decision before us. Yes. So I assume you're asking about the- The agreement issue, yes. The coverage gap discount program agreement requirement. Yes. So under Loper-Bright, it is this court's job to resolve the meaning about statutory provisions whose meaning is disputed by the parties before the court. It is not this court's job to tell parties what arguments to make to the court. And therefore, here, this court simply does not have a dispute before it about whether that particular provision of the statute- There's a different rule under which we can affirm a judgment on any ground supported by the record. And this is a legal question. We are post-Chevron, so there's no question about if you're in the gray area, the agency can go either way. It's just pure legal question presented that's potentially dispositive and, to my judgment, looks a little bit more straightforward and cleaner than the one you all want us to address. So I think the important point is that this is CMS's statute to enforce, and they have not put before this court any argument that we have- The district court has put it before us. Yes, but I think there's no argument by the parties in front of this court that that requirement hasn't been met. And I think for that reason, the requirement here is not just forfeited, it's affirmatively waived. And in addition, for that reason, actually affirming on that ground would violate the party presentation principle. I think the Supreme Court summarily- We wouldn't- That would invalidate our rule that Judge Katz has just referenced, that we can affirm on any basis preserved in the record. It's not- It wouldn't be the first time that we would do such a thing. I'm not saying we will in this case, but it wouldn't be the first time we've done that when the parties were focused elsewhere. I think when this court does that, it is traditionally when an argument has been made below and made before this court, the court below hasn't actually reached that issue. I can point this court to the Supreme Court's recent summary reversal just last month in Clark v. Sweeney. The Supreme Court summarily reversed the Fourth Circuit for violating the party presentation principle, for reversing it, granting habeas relief in a case based on arguments that the- They were reversing. The Supreme Court reversed, that's correct. Did the Fourth Circuit reverse the trial court? I would have to check, Your Honor. I thought you said that they had reversed something. The Supreme Court summarily reversed the Fourth Circuit. I mean, but it matters because this is a rule that allows us to affirm not- Alternative grounds to affirm are a lot easier for us to reach than alternative grounds to reverse, where you are running squarely into the party presentation. The Fourth Circuit has reversed the trial court in that case. I'll point that out. So I think the other- I think there's- we have affirmative waiver here, not just forfeiture, affirmative waiver. The other thing- I get all that. And there are some prudential considerations cutting in favor of our not resting on that ground. I think there's- But there may be others. I mean, maybe others to cut the other way. Well, if I could- I think this is very straightforward. Here's- I think here's another reason, if you were sort of getting towards the merits of this argument. One of our arguments for why it was incorrect for the district court to determine that this requirement in the statute had not been met is that that was not the basis of CMS's decision, and therefore, it violated Chenery. I think by affirmative- It doesn't violate Chenery for a court to enforce a legally mandatory requirement. Chenery is all about discretionary decisions. And maybe pre-Loper-Bright, close interpretive questions had an aspect of that, but not anymore. This is either covered by the CGDP agreement of such manufacturer in such year. If it means what it seems to say, the Ulivis period will stop. So, I can give you yet another reason why I think this court should not affirm on that ground, which goes straight to the merits skipping past Chenery, which I do think is a problem. Let's just finish up on preservation. I'm interested in the merits, obviously, but just give me all you have on preservation and then- I'm sorry, on preservation. On prudential considerations, why do you think we should not reach? So, I think there are three. It's affirmative waiver. It's affirmative waiver, not arbitrary. It's a party presentation principle. And it's the fact that this was not the basis of CMS's denial, so it would violate Chenery. If you go to the merits of this CGDP agreement requirement, I think both parties are correct on the merits here. So, if you go back to 2021, the CGDP statute required Servier to include TIPSOVO on its coverage gap discount program agreement. But CMS, at the time, prohibited Servier from doing that. In its guidance under the coverage gap discount program agreement, Servier-CMS told parties like Servier to leave TIPSOVO on the old manufacturer's coverage gap discount program agreement and just work things out between themselves. That's what CMS told us to do, and so that's what we did do. Now, today, if CMS had allowed-had followed the district court's interpretation of the statute, CMS would be telling Servier that actually Servier was violating the CGDP statute back in 2021, and as a result, it's also violating this statute now. And that kind of inconsistency is quintessentially arbitrary. If there are no further questions on the coverage gap discount program- It sounds a little bit like an argument that the government's prior misinterpretation of a legal duty immunizes violations going forward. I wouldn't characterize it that way. I think an important aspect of the way that CMS implemented the CGDP program back in 2021 is that it was implemented through agreements. So the requirement was that Servier had to include TIPSOVO on an agreement between TIPSOVO-between Servier and HHS. Servier can't do that unilaterally, obviously. It's an agreement. They can only put things on the agreement that HHS will agree to, and HHS had guidance that said, we will not agree to that. We want you to keep it on the other agreements and work things out between yourselves. And so that's what we did. The agreements are filed roughly a year out. They're filed before the year. The 2021 agreement would have been filed before January 1, 2021. I don't recall whether the agreements are annual or updated, or are they just ongoing? I'm not sure. What I was going to ask, maybe you don't know, are they, once they're filed, is there some mechanism for mid-year amendments? There is certainly a mechanism for adding new labeler codes to an existing agreement, but you can only add full labeler codes. You can't add an individual drug. The labeler code identifying the manufacturer. We could have put all of AGIOS's products on Servier's CGTP agreement in 2021, but that's not what the transaction was between Servier and AGIOS. We only bought the one drug, and so we couldn't put only the one drug that we bought onto Servier's. You bought the entire company. You could have amended the agreement to reflect all the new drugs of that company, and that would have solved this aspect of your problem. Yes, we could have put the whole labeler code on, but we could not put on the individual drug that we bought. That was impossible, and impossible requirement. No, sorry. I'm interrupting you. Sorry, but the basic idea is the greater power to amend mid-year as to all the products of an acquired company suggests a lesser power to do an amendment just for the one drug? It's not a greater-includes-the-lesser sort of situation, because the mechanism for the amendment is you put the labeler code on the agreement, and the labeler code includes all of the drugs for that labeler, for that labeler code suggests a lesser power to add the drug code? It's a friendly line. Yes. If you're asking whether CMS could have administered the program drug by drug so that we could have done this, yes, CMS, HHS absolutely could have done that, but they didn't, and there was nothing we could do about that unilaterally, that we were at HHS and CMS's mercy at that time. If I now turn to the arguments that the parties have actually disputed before the court, I want to start with our argument that the analysis under the statute is product by product and not unit by unit. Can I ask a fact question for you? Yes, please. This labeler code, where does it appear? Is it on the pill? Is it on the bottle? Is it on the palette? It is not required to appear, but in general, the FDA's regulations recommend that it appear on the box. So if I buy an individual box of Tylenol or something, it will have a labeler code on it? It's recommended by FDA that it appear there, and it most likely would. Okay. Otherwise, it is simply a reporting form. It's used for reporting at a minimum. It's a record-keeping mechanism for FDA to keep track of different drugs. And I thought, like, sales of drugs, at least to Part D beneficiaries, had to be reported to as well? Yes. Through the labeler code. Yes. So there's a mechanism called PDE-DNF under Medicare Part D in which the insurance company, after the fact, submits a record to CMS of all the transactions that have happened. It includes a lot of different pieces of information, you know, what the drug was, what the price was, the copay, other information. And among the pieces of information there is the labeler code. It's who manufactured the drug the Part D beneficiary received. It's not actually the manufacturer. It's just the labeler code. The labeler code identifies the manufacturer. You said that already. That's one of the things the labeler code does is identify the manufacturer. It can. And if I said that, I misspoke. The labeler code can identify the manufacturer, but that's not the only person it can indicate. It can indicate the repacker, the relabeler, and most relevant here, it can indicate the private label distributor. Sales can be made without knowing who manufactured the pill. That seems really troubling in case there's any sort of adulteration or contamination processes. It's not that it's not known. It's just that that on the box can refer to entities that performed a number of different roles in the manufacturing process. It can include the manufacturer, but it could be the relabeler, it could be the repacker, or it could be. What would identify the manufacturer? There's no. They don't know. They've got to be tracing who manufactured the drugs. It's not the labeler code. I mean, our position would be that the NDA indicates who is really the manufacturer. When the insurance company is providing information to Medicare or CMS about sales to Part D beneficiaries, it identifies the manufacturer as Part D. It does not identify the manufacturer. It identifies the labeler code, and the labeler code may indicate the manufacturer, but it may not. Okay, and then what if there's something wrong with the pills? How do they find who manufactured them? They know who's gotten it. That's an FDA enforcement issue, and they have investigatory powers. They can look at who held the NDA, but they don't. The labeler code is not how they determine who is the manufacturer, because we quote and cite the FDA's NDC or National Drug Code regulations in our briefs, and it is clear as day expressed in those regulations that the labeler code can indicate entities that are not the manufacturer. Where is that? Which regulation is that? I don't have the site in front of me. I'll give it to you on rebuttal if that's all right. But the other thing is that 21 CFR Section 207.33C requires that if you're engaging in manufacturing, you're to update that labeler code within 30 days. So why wouldn't that be a necessary requirement that you couldn't wait six months to do that? I'm sorry. I'm not following your question. You're required to update the labeler code information within the 30 days. You didn't do so here, and then now you're seeking credit, basically, for that labeler code, you know, with respect to the sales. I'm not sure what the regulatory site you provided is referring to and what kind of update you're referring to. I can try to look at that on rebuttal. But the critical point, I think, for the Court to understand is the labeler code does not necessarily indicate the manufacturer. It simply doesn't. And I think that's, you know, the district court cited and quoted. What does it indicate? What's the point of the labeler code? It indicates an entity that engaged in one of several possible activities with respect to that drug. It can indicate that it was the manufacturer. It can also indicate that it's the labeler or the repacker or the private label distributor. And actually, in this case, the two labels we're talking about here, the AGIOS's label from 2021 and Cervier's label from 2022, those labels indicate that AGIOS and Cervier, respectively, were the private label distributor of this drug. And I think it's important for the Court to remember that the manufacturing definition in the statute carves out distributors. So an entity that is a mere distributor is not a manufacturer under the statute. If I can go back to our main statutory argument, which I think sidesteps a lot of these issues, that is our argument that the analysis is product by product, not unit by unit. The key statutory language... Which is an odd framing. I mean, you have some nuggets and there are aspects of this statute that one can read to support that. But it just seems like a very odd framing in the context where this is all about items that are paid for by Medicare or CMS. They pay for individual increments of this drug. They don't pay for the product. Yes. Everyone agrees here that to calculate the relevant total expenditures here, you need to aggregate expenditures for multiple TPSO units. The question before the Court is, do you aggregate some TPSO units, the ones with the right labeler code on them, or do you aggregate all of them? And our interpretation of the statute is simple. Total expenditures under... I suppose for the sake of argument, just to untangle the statutory argument from the arbitrary and capricious argument, suppose for purposes of the question, we think the labeler code just means the manufacturer. So... And I know you dispute that. Yes. And I don't think that the government actually disputes that either. The government's view is that the labeler code is a proxy for the, quote, actual manufacturer. Okay. Fair enough. Suppose it's a reasonable proxy. Forget about the code and let's just talk about the substantive law. Okay. I believe there are two questions there, so I'll try to answer them in turn. So even if you think that the labeler code is a reasonable proxy for the actual manufacturer, it is not the only possible proxy. Another one, for example, would be who holds the NDA. That is, in fact, how CMS itself today... Diving back into the arbitrary and capricious argument. No, no, no. I want to stay on the contrary to law point for now. Okay. So our point is simply that the... Our interpretation of the statute is simply that the total expenditures under Part B for one of the specified small manufacturer drugs of the manufacturer, and I think everyone agrees that that refers to a product, not a unit. So the total expenditures for that product means all of the expenditures for that product. Now, Judge Katsas, you suggested that that might have some counterintuitive results. I would welcome the opportunity to explain to you why we think that actually makes sense in light of the statutory purpose. Okay. So the counterintuitive ones are the December 31 acquisition where 99% of the stuff is manufactured and sold by the predecessor company. Absolutely. And you want attribution of all of that. Yes. So I think the important thing to remember is that the purpose of this statute, the purpose of the specified small manufacturer definition is to identify a particular kind of manufacturer, a small manufacturer with a non-diversified Part B product portfolio. When you're evaluating the diversity of a company's product portfolio, it is quite reasonable to do that analysis product by product. Now, we can talk about the edge cases, but just a product by product approach is certainly a reasonable way for Congress to approach this question overall. And it goes specifically to this hypo. Yes, under a product by product approach, under your hypo, all expenditures for the whole year for that product count towards the 80% threshold. That result may be counterintuitive, but it doesn't undermine our product by product reading for a couple reasons. First, I think at least part of the idea behind that hypothetical is that it seems to allow a manufacturer to gain the system in some way. But it's important to remember that this is a 2022 statute that is keyed to events that occurred beforehand in 2021. So, there is absolutely no possibility of gainsmanship here. Congress, by the way it designed the statute, eliminated that possibility. And in fact, for that reason, we know sitting here today that that hypo that you posited won't ever actually happen. The government already knows the entire universe of cases to which this statute will ever apply. And it has already made virtually all of the determinations that this statute will ever require. I do think even if this scenario could happen, it still makes sense. Fair point about gainsmanship. You still have a statutory structure that seems to use events in the past as a proxy for, you know, a prospective assessment of are you small enough and are you non-diversified enough? I couldn't agree more. And I think that's why the product by product approach actually does even in the hypothetical you gave of the December 31st acquisition. So, Congress was trying to determine in 2022 whether, you know, identify the manufacturers that are small and non-diversified. It does that by looking back to 2021. There's nothing magic about 2021. It's just the last full calendar year on record. So, if during 2021 you have a company that has one product that the sales of all of its other products, odds are that that product is going to dominate their sales going forward into 2022 as well, even if they only made one unit. And I think actually if you've only focused on that one unit, you would really get a misleading picture of the diversity of that company's product portfolio. And I think that's actually exactly what happened here. Servier acquired this product in April. It began manufacturing the product. It was earning revenue from this product because of a quirk of how FDA allows a manufacturer like Servier to use the old manufacturer's labeler code during a transition period. The labeler code wasn't used during 2021. But going into, you know, the sales from that product during 2021 worked everything else they were doing. And going forward into 2022 and forward when these discounts are actually going to kick in, TIPSOVO again was still dominating the entire portfolio. So, another way to put it, Judge Cassis, would be that the government is suggesting with that hypothetical that our rule is over-inclusive. I think their rule is under-inclusive because it doesn't account for this kind of situation where we're exactly who this statute was denied for. Servier was small. That's undisputed. That's the specified manufacturer part of the statute. And we clearly had a non-diversified product portfolio going into 2022. That's exactly who we had. We clearly did not manufacture, as in, think of manufacturers as what was sold. It was made and sold that year to Part D beneficiaries, which is also what the statutory language closely focuses on. What did you make that you sold to Part D beneficiaries? And my understanding from the record is that what was made and sold to Part D beneficiaries in 2021 was, I don't know how to say, IGEOS's pre-existing stock. 100% pre-existing stock, which was not in any sense manufactured by. It was manufactured, all done being manufactured before the agreement was inked. And it was then sold to Part D beneficiaries. What's wrong about that? So, if the analysis is product by product, the only question for this court is did Servier manufacture the product? And we undisputedly did. You want to say just because we all, two entities here, I'm assuming IGEOS as well, were small and non-diversified. One of them actually manufactured 100% of the pills that were sold to Part D beneficiaries in 2021. And one came in later to own the rights to those pills, but did not manufacture them. It just said, well, I've got this pile of pills over here. Let's let it out in the market so I'll make some money off of it. So, if the analysis is product by product, that doesn't matter. I take it you're positing that you would interpret. Why Congress would, what do you mean? I'm not sure you mean product by product. The product had to be, by the statutory terms, had to be what was sold, what was manufactured and sold to Part D beneficiaries in 2021. Those are other statutory requirements. That's what Congress was focused on actually. And if they were, if it's pre-existing stock, you didn't manufacture something that's already made. So, I think that you're pointing to the manufacturer language in the statute, if I understand your question. And I think that the important textual point on that is that of the manufacturer comes after the words, one of the specified small manufacturer drugs. I think everyone agrees that that phrase refers to a product as a whole. And just adding the prepositional phrase of the manufacturer after it does not mean that one of the specified small manufacturer drugs is some subset of a product. It's still a whole product. It's just a particular kind of product, one that was made by the manufacturer during the year. And Servier undisputedly did make Tibsovo during 2021. I think that the broader question you're getting at, I think, goes to- You didn't make Tibsovo. You did not make it, physically make it. That is- Oh, I'm sorry. Well, it's Departee Beneficiaries in 2021. That's the record before us. Yes. We made units, and those units were not sold until 2022. Right. It's not until about this year, particular year. And I think the point, Your Honor, is simply that that timing cork doesn't matter if the analysis is product by product. But I see that you may not agree with me on that. So, let me explain why we can still win even if you do disagree with me on that. So, I have two answers for you about what we actually did in 2021. One is the actual story of what we did, which is what we would show to the agency on remand if given an opportunity. And the other is what we already showed the agency based on holding the NDA. So, if you're looking at what we actually did and what we'll on remand if we have an opportunity, we can give CMS a lot number for a tipsovo that was actually dispensed to heart D patients in December of 2021. And then if you trace the manufacturing process for that lot backwards in time, on April 1, 2021, those tablets had been physically pressed, but they weren't labeled and packaged and ready for sale. So, what happened was that after April 1, CRVA's contractor put those tablets in bottles, labeled and packaged the bottles in boxes, and put serial numbers on the boxes. And then later in the year, in 2021, units from that lot were dispensed to heart D patients. So, we can draw every single link in that chain. So, that is what actually happened and what we can show on remand. Manufacture is defined, right? And you have to manufacture and you have to be a manufacturer. And that means that you were engaged in the production. You weren't. Preparation, you weren't. The propagation, you weren't. The compounding, you weren't. The conversion, you weren't. And the processing, you weren't. I think we were involved in the, I left out in the story that I just told, there's one piece I left out, which is that CRVA personnel reviewed the quality control documentation from the contractor and affirmatively. That was not before the district court. Correct. That's not before the district court. That's not before us either. Correct. I'm trying to answer your question as to what we can show on remand. So, if there's a remand, this is what we can show. Okay. I'm just trying to. Whatever you can show on remand is not really of much interest to us because you have to show to get a remand that you were a manufacturer and you made no record. Even assuming the quality control comes, which isn't on this list. So, what did you, you did not show on this record that you met the statutory definition of manufacturer. You showed that you owned the pills. And a lot of your briefing is clear, you owned, you owned the NDA, you owned the pills, you owned the rights to those pills. I get all of that, but owning is not the same as manufacturing. And this is a very specialized definition here that really is focused on, you know, the, I mean, it goes on with, you know, use of chemical synthesis or extraction and chemical synthesis. I mean, it's really talking about the process of making these pills. And am I right that every single pill that was sold in 2021 to a Part D beneficiary was stock that pre-existed the inking of your agreement? The pills were, the pills were physically fast. Yes. If you're asking about what the pill. Was manufactured while after you took over the rights to this drug in 2021, that went to a Part D beneficiary that year. Depends on what you mean by manufacturing, but. The statutory definition, the statutory, it's got to be making it in some way. And if everything that was sold was already made, then you didn't make it. So, let me explain why I think that's not correct. So, yes, the tablets were physically pressed before April 1. So, that factual premise of your question is correct. We don't dispute that. As the NDA holder, we were legally responsible. And I think there's a very important point here, which is that the government's only response to the argument that the NDA is insufficient is that we didn't preserve it. So, this court does not need to get into these merits questions at all. So, if we preserve that argument, there's no further dispute about the merits here, but you've asked about the merits. So, I want to answer your question. I don't think they agree that just holding the NDA makes you the manufacturer. They don't affirmatively agree, but they do not articulate any argument in their brief about why that's wrong. And their view wasn't raised below. But there's nothing that there's nothing in the statutory language that cares about who owns, who has legal obligations with respect to. It just doesn't. It's not the statutory language used here. They're focused on the manufacturer. And so, the reason, again, this gets to the merits. So, this is only if you reach the merits, even though the government hasn't argued it. But reaching the merits of this NDA argument, the point is the following. Cervier, as the NDA holder, was legally responsible for the labeling, the quality control, and the manufacturing of every unit that was sold after April 1. So, for example, if FDA had determined that the label on units sold after April 1 was missing a warning, for example. I get all of that. You owned all legal consequences. That's not what they're talking about. What is your best language to say that the definition of manufacturer includes someone who took pre-existing stock, did not make a pill, but had legal responsibility for it? Which word do you put legal responsibility into? I think we have legal responsibility for all of those words. Well, there was no more production. There was no more preparation. There was no more propagation. There was no more compounding. There was no more conversion. And there was no more processing as to those that pre-existing stock. So, what I think your Honor is suggesting is some kind of actual mission distinction. And there are many areas of the law where- I don't think I'm finishing the law. But I'm talking- tell me which word. So, the words in the statute include either directly or indirectly, which I think includes adopting actions taken by others. And I think it's important to- this is a situation where it makes sense to hold- Which action? I'll take it directly. Which one did you- because you had all pre-existing stock. So, we- Did you produce it? Yes. If it already was produced, how did you produce it? Because we were responsible for it. And here's how- I understand the NDA comes with legal obligations to you, right? If something had been gone- you know, got contaminated in your storage process, you're going to be held responsible for that. Or in your trucking process, you're going to be held responsible for that. That means you're distributing and you're legally responsible for distribution and maintaining quality control during distribution. That does not make you the manufacturer. So, this is- CMS itself disagrees with you on that point, Your Honor. In- this is not a novel argument. So, in two other drug pricing programs, CMS itself today implements a materially identical manufacturer definition to say that it includes the NDA holder. That's the Medicaid Drug Rebate Program and the Drug Price Negotiation Program. So- I understand there's other statutes, but that just shows that the language that is used here is very, very particularized. Materially identical language. Absolutely identical. You can look at the statutes, they are- there's no difference between them. And in the Medicaid- in the Drug Price Negotiation Program, when they were putting out their guidance on this- on that program, a commenter made exactly this point to CMS. They said, you should use the labeler code, not the NDA holder. And CMS said, no, that's wrong. We disagree. We should- the- we are going to treat the NDA holder as the manufacturer because that fits with, quote, the FDA regulatory framework. So, that's- Is that a statute? For an absolutely identical statute. That is a distinct statute, yes. But the manufacturer definition is identical. Some of that- some of the other ones include things like labeling, packaging, distributing. It's not- not the Drug Price Negotiation Program. The manufacturing definition is exactly the same, Your Honor. If I could pull back from the merits for a moment- And the use of that word, manufacturer, in the statute- in the other statutory provisions, the APITA provisions. It has- it uses the word, manufacturer. And the definition of the word, manufacturer, which has those six- those six activities, is exactly the same in the Drug Price Negotiation Program as it is in the statute here. And CMS, today, says that that means NDA holder in that program. That's it. Okay. So, you don't think that updating the labeler code has any effect on your arguments when that was a requirement as well? I'm not fully following your question, Your Honor. I apologize. So, it says that you're supposed to update your labeling code, you know, once this agreement changed hands. I see what you're saying. Yes. So, the reason we did not label this inventory that we were selling in 2021 with our labeler code is for a couple of reasons. First, this is common industry practice. In addition, it would have been wasteful to get rid of that stock. In addition, it would have created a break in the supply chain, a break in the supply of this life-saving medicine to patients to have to relabel everything. And importantly, FDA has a long-standing policy that allows manufacturers in precisely this circumstance to use the old labeling during a transition period. That is noted in our recalculation request with the JA 112 footnote 3. It doesn't use the word FDA, but that's what that footnote is referring to, is this long-standing FDA policy that allows manufacturers to use the old labeling in these circumstances. So, that's why we did it, because we were permitted to do so. But they don't suggest that they buy that reason, because they're not allowing that rationale to go forward. Yes, and there was no—I think that that goes to our arbitrary and capricious argument, if I understand your question. And so, there was no—the denial includes no explanation whatsoever for why CMS was attributing expenditures at TIBSOVO to manufacturers based solely on the labeler code. The government's brief tries to fill in that gap in reasoning, but none of their explanations appear in the denial itself. The denial is at JA 119 to 120, and it's just not in there. All that the denial says is the guidance and the methodology say to use labeler codes, so we're going to use labeler codes. We told them at the time, we don't think that makes sense here. We're the NDA holder. You should consider using the NDA. And there is no explanation whatsoever for why they didn't do that. And again, this was—this is not an off-the-wall novel idea to use the NDA rather than the labeler code. It's exactly what CMS itself does today in two other drug pricing programs. So, at a very minimum, I think you need to set the denial aside and send it back for a new explanation for why they chose this particular proxy, the labeler code, and not the NDA. If I could—because there were so many questions about the merits of the NDA argument, I do want to go—I see that I'm far over my time, but I want to go to preservation, but only if it's helpful to the court. Preservation of the argument. Of the NDA argument. Yes. Okay. I think we have your briefing on that. Okay. But we will give you some time on rebuttal as well. Thank you very much. Good morning, Your Honors. And may it please the court, Sean Janda for the federal government. I intended to start this morning with the lead statutory argument pressed by Cervier. And in the absence of any contrary direction from the court, I'm happy to start there. I think the easiest way to understand why that argument's wrong is just to substitute the definition of specified small manufacturer drugs for those words in the relevant provision, which the district court did at JA 224-25. We did it at page 26 of our brief. When you make that substitution, the statute then directs CMS to focus on, quote, the total expenditures under Part D for any one of the drugs that is produced, prepared, propagated, compounded, converted, or processed by the manufacturer. I think once you make that substitution, it becomes clear, again, that CMS is acting fully consistent with the statutory text in focusing on who actually produced, prepared, propagated, compounded, converted, or processed the drugs for which there are Part D expenditures. And I think once you agree with us that that's the right focus, there's just nothing, I think, in the record here. Sure. Where did that get us? Does that put us right back in the question of what do you mean by produced? What do you mean by prepared if we had to, you know, we are now the ones that are charged. We own it and we're in charge of it. So I don't think so, Your Honor. And I think you could imagine arguments if they made an argument in front of the agency or in front of the district court that says, you know, we did this thing and that thing and the other things that count as one of these words. They just didn't make that argument. And I don't want to get ahead of the agency if they had made that agency. You know, I don't know if the agency would have thought that doing the quality control or doing the labeling or packaging the product, which they now say they did, would have counted as one of those words. I just don't know. And so I think sort of once you accept that we're right about the statutory argument, at least as to the one legal argument that I think they have consistently pressed sort of starting in the agency and through this court, which is that it doesn't matter if they actually manufactured any of the units that sold to beneficiaries in 2021. It makes clear they're wrong about that. And then for everything else, all I think we're in a position to say is that on the record before the agency, we certainly didn't see anything that suggested that they produced, prepared, propagated, et cetera, the actual units sold in 2021. I think they now think they could make that showing, but they certainly didn't do it before the agency. And then, I mean, the other thing I'll just sort of say briefly is I think in addition to that kind of clear textual argument, just every feature of the statute focuses on the manufacturer over and over again. It doesn't sort of talk about it. It wasn't very easy to talk about the distributor, the seller, the NDA holder. It doesn't do that. I mean, it really focuses on the physical process of manufacturing the drugs for which there are expenditures in 2021. And that's where the agency is focused, and I think that's just where the administrative submission sort of starting off falls short. The labeler code is not defined in 42 U.S.C. 1395, but you all use that as a way of essentially being a determinative factor as to who the manufacturer is. So, how do you explain that? Yes. So, the labeler code is given by the FDA to manufacturers, and I think the expectation is that the manufacturer or in some circumstances a repackager or relabeler puts their labeler code on the product. And so, what the guidance that CMS applies here says is that, you know, the labeler code is what the manufacturer puts on the product. We're going to use that, I mean, at least as a first pass. You know, I think, again, industry understood term in that regard that the labeler code is for the manufacturer. Yes. So, labeler codes are given, I think we said the statute, actually the FDA, not CMS, but the FDA provides labeler codes to manufacturers, I think packagers, labelers, and then the labeler code is going to identify the manufacturer or potentially the repackager or the relabeler. I think if we had a circumstance where someone came in and said, you know, we actually manufactured this stock, it was then repackaged, and the repackager sort of took off our labeler code and put on their labeler code, but you should give us credit for the stock because we actually manufactured it, the agency might well sort of take a look at that evidence and determine that it's appropriate to disregard. And then how do you respond to your opposing counsel's arguments with respect to the NDA as opposed to the labeler code? I mean, I think there's a couple of things. I think just as a legal matter, again, it would be very easy to write the statute to focus on the NDA holder or the owner or the seller, and it doesn't do that. It focuses very much on the physical process of producing, which I think the guidance reflects CMS's determination that the best evidence, or at least sort of the starting point of who did the actual manufacturing is going to be the labeler code. And again, if they come in, they said, you know, we did A, B, C, D, and E physical things to this product, even though it has someone else's labeler code on it, the agency may well have been willing to engage with that evidence and disregard the labeler code, but that just was not a thing that was ever presented to the agency in this case. Can I take it back to your plain language argument? So I'm trying to do on the fly what you suggested, which is plug in the special small manufacturer drug definition into the legally operative text, and I'm going to elide over some things that seem to me clearly immaterial. So when I do that, I get total Part B expenditures for any drug manufactured by the manufacturer. Fair summary? I think the first part is right. For any one of the drugs manufactured by the manufacturer, you have to be right. But just reading those words, and the TIPSAVA was manufactured by the manufacturer in 2021, and then the statute says what are the total expenditures, total Part D expenditures for TIPSAVA? That seems to not, just those words do not seem to foreclose your friend's interpretation. So even if you think that they're not foreclosed by the statutory text, I think just every relevant indication of the statute focuses in on sort of particular expenditures for a particular drug stock manufactured by a particular entity, and it starts with the expenditures, which I think is just what I observed earlier. Medicare doesn't make expenditures for a drug line. It doesn't buy TIPSAVA as a product as a whole. It makes expenditures for a particular dispensing of TIPSAVA to a particular beneficiary, and we really have to focus in, on those expenditures. Second, yes, in the sense you have to focus in on Medicare expenditures on TIPSAVA. No question. You can't focus on, you know, Blue Cross expenditure on TIPSAVA, but that doesn't answer the question, you know, one level more granular on sort of Medicare expenditures on TIPSAVA or the pills that, whether, you know, the predecessor manufacturer or the successor manufacturer. Right. I think that sort of the frame of the expenditures puts us talking about particular stock rather than talking about the drug line as a whole. Even if that doesn't do it for you, and I think, again, we have sort of one long definition here, but it's all linked together, as Judge Moss observed. I think TIPSAVA sort of tries to break out, or sorry, CERBIA tries to break out the different pieces of what is really a connected phrase and tries to take them all in isolation, which is not really how the statute reads. I think in addition, as earlier. How are they trying to do that? They just have a, you know, you heard it, a holistic theory, right? This is about projecting what's going to happen in 2022 and, you know, who owns the drug on. This is not a crazy way. Their reading of the statute is not a crazy way to assess who will be a small and non-diversified manufacturer in 2022 based on, you know, what's happened in 2021. And I think it does lead to a bunch of anomalies, which I'm happy to talk about. And I think the one that they have sort of managed to explain why they think it's not so anomalous is, like, maybe the only one where they could say that. But just focusing on, but before I get to that. I think the December 31st hypothetical. Right, and I understand the response to that, but if you could. That seems to be very anomalous, but the answer, your friend's answer resonated a little bit. I mean, fair enough. I think if you flip the hypothetical and make it a single pill on January 1st, and then they divest the line, then you don't have the answer that, you know, while it will tell you what's going to happen in 2022, because it's right before 2022. But I think it would be the exact same thing. I think they would say if you manufacture a single pill on January 1st, that's then sold to a party beneficiary, you are entitled to all of the expenditures for, for that pill or for that drug for the year, even though at the end of the year you don't have, you don't have the line anymore. I also, I mean, the other thing I would say is they also would apply in circumstance where throughout the whole year you have multiple manufacturers manufacturing the same drug through licensing agreements or otherwise. I think, again, under CMS's view, you know, each manufacturer would presumably put their own labeler code on the stock that they manufactured and would get credit for those expenditures. Again, under SurveyA's view, I think each manufacturer would be entitled to the total party expenditures of all the manufacturers making that same drug, which, again, just doesn't, if you're trying to think about who's small and non-diversified, doesn't map onto the actual manufacturing activities and the drug portfolios. And so, I mean, again, just CMS's high-level view of how this is supposed to work is just that you match up who actually manufactured the pills with a particular drug manufacturer, you aggregate those together, and then that gives you a sense of the drug manufacturers, both sized and diversified or non-diversified status, and moving away from the actual manufacturing of the drugs, I think, would introduce those anomalies. The way you know, so assume I'm a Part D beneficiary and I get some Tibsovo, my insurance company, to pay for it, or the insurance company intermediary works it, how do you know? I assume it's a labeler code, or no? So, I think if you were trying to figure out who manufactured it, if that's your question. That's what you have to do. You have to know, you line up all the Part D beneficiaries and all their Tibsovo, right? You figure out who made it. Right. You have to go back and see if it's diversified or not. Right. So, the first thing that you do and the first thing that CMS does is just aggregate all the data. When there's a dispensing of the drug, the pharmacy or whatever, fills out a form that includes the labeler code that gets sent back to CMS. And CMS just sort of starts by pulling the labeler code. And I assume that's because there's an assumption of labeler code. You rely on that because that identifies, generally identifies, the manufacturer? Correct. As I said, I think, I don't think survey disputes that in the mine run of cases, the labeler code is going to accurately identify who actually manufactured the product. If there were a non-circumstance where that weren't true, the agency, I think, would have to confront that. But I'm aware, it's not in the record, but I'm aware of at least one manufacturer that came to CMS with exactly that sort of information where they said, you know, no, it was someone else's labeler code. It's kind of an unusual situation. But we did the thing and CMS looked at the evidence they submitted and ultimately determined that it should disregard the labeler code. But you rely on the labeler code. Is the pharmacist reporting who owns the NDA? I'm not sure what all information is in the prescription drug event records that get sent back to CMS. I know the labeler code is there. I just don't know if the NDA holder, unless it's reported on the package, I would assume it would be a thing that they wouldn't report. But I don't want to say that for certain because I've not seen what these records look like. Right. But it sounds like the way the system is, the way it's set up is, okay, these drugs are getting dispensed. I got to know who manufactured it for purposes of doing this analysis, maybe for other reasons too, but certainly for purposes of this analysis, I get the information based on the labeler code and the labeler code comes up to me. And then we can do the math, figure out who qualifies as the, sorry, the wording of this is a specified small manufacturer. Right. And that's sort of how CMS has done it. And there's nothing in the record here that I think would include CMS into the idea that the labeler code here did not actually identify who had produced, propagated, the pills that were being sold in Hong Kong. Okay. Can I ask you about the alternative theory? It just seems very clear to me that Tiptoe was not covered by the CTC agreement of Cervier for 2021. Why doesn't that resolve this appeal? Right. So I think the problem that we have with that is that my understanding is there is a very long historical practice of CMS that allows one manufacturer to sort of piggyback on other manufacturers' agreement, which helps ensure, I think, sort of uninterrupted Part D coverage of when drugs sort of change hands. And so CMS's understanding has been that in a circumstance where one manufacturer is piggybacking on a different manufacturer's agreement that you sort of treat that piggybacking as the agreement of a piggybacking manufacturer. And so CMS would not, my understanding is, would not have in this circumstance or another circumstance refused to attribute expenditures to Cervier or to another drug manufacturer because they were piggybacking rather than listing the code number of the drug on their own agreement. So it would be just on the facts of this case, April 1 sale, and then by December 1, pills manufactured by Cervier are paid for by Medicare, and you want to count those pills. Right. So for these purposes, you don't want the lack of a CGDP agreement to disable that attribution. I think that attribution in this difference between the two theories, like where does the difference matter? I think it matters for purposes of this particular statutory determination in exactly that context. My understanding is that... The one I just said. Correct, where it's still on the actual manufacturing sales. But just to be clear, my understanding from the agency is that there is a fear that it would destabilize if it were right to not permit this sort of look-through attribution of the one manufacturer on the other agreement that may destabilize other circumstances where the agency has sort of long-permitted that sort of piggybacking, which ensures, again, sort of hearty coverage of drugs uninterrupted in this circumstance where they change manufacturers. And what's the government's response to Cervier's argument about its normal business not to change the label? So my understanding, Your Honor, I'm not sure about the regulation that you're referencing. My understanding is that the CMS or FDA, it's probably FDA actually, would not have a problem or does not have a problem with sort of already manufactured pills having the label or code of that they need to manufacture them, even if they are then bought as pre-existing stock and sold in these circumstances. There's no requirement that the label or code be updated to reflect a new distributor or seller, which I think also sort of underscores that the label or code is added generally at the time that the manufacturing happens. And so it's a quite good proxy for the manufacturer rather than for the seller, the distributor, pharmacy, anything that involves people further down the chain, which we think the statute focuses on. Looking to the label or code to determine the manufacturer in some instances. I'm saying, I think my understanding is that because the label or code is often put on when the product is manufactured, it is a quite good proxy for the actual manufacturer rather than for the distributor, the pharmacy, the seller, further down the supply chain. Can you explain to me the piggybacking one more time? Because the way it's described in your brief sounds like it's the inverse of this case. So tell me. Define piggyback for me. So my understanding, which comes with all the usual copyouts of my understanding of CMS, is that in a circumstance like where one drug manufacturer has a product on their program agreement or had a product on the program agreement and then they sell the product line to another manufacturer, as happened here, CMS permits the acquiring manufacturer to piggyback on the manufacturer's agreement for the purposes of that drug. And the reason for that is that it ensures that there's uninterrupted Part D coverage because sort of inclusion on a program agreement is a requirement for Part D coverage. And so that there is a desire not to have an interruption in coverage by having to sort of transfer or amend agreements. But what your footnote says is, thus, if Part D had incurred expenditures, and I could just be misunderstood, but in 2021, for Tegsovo, that was covered by AGIOS's agreement, but the Cervier had manufactured under its own labeler code, you would go ahead and attribute this to Cervier. But that's not what happened here. Right? Cervier didn't manufacture anything under its own labeler code. So this doesn't, your example doesn't fit this case. It fits the opposite. Right. Sorry. So what we're saying is that if Cervier had actually manufactured and produced under its own labeler code, CMS would not treat the fact that they were- They don't fall within this piggybacking exception. We do not think that they fall within- No, no. They don't fit within your piggybacking policy. I mean, I think they, until they listed it on their own agreement, they were piggybacking on AGIOS's agreement, which is not just- What I'm saying is, piggybacking would occur, right? Because you already have Tegsovo covered by AGIOS's agreement. They got the agreement. But if Cervier had manufactured under its own code, then Cervier could piggyback on the agreement. But that's not what happened here in your view. Correct? Correct. Okay. So then they can't fall within your piggyback exception. So this may be an imprecision. So why aren't we going back with the statute? So this may be an imprecision in the way we directed. My understanding- Well, it's not an imprecision. I mean, you talk about Cervier manufacturing. So I think there's- And using its own labeler code. Piggybacking for a lot of purposes, piggybacking is not a thing that CMS permits for this purpose only. And so what we are saying is that once Cervier is the manufacturer of the drug, has acquired the drug, they may- I'm sorry. I'm very sorry to interrupt, but you just said two very different things. Once Cervier has manufactured the drug, and then you said once they have owned the drug. But those are two very different things.  What is required to piggyback? Do you have to actually have manufactured? If you're a manufacturer, then you can piggyback on someone else's agreement. I believe if you own it, you can also piggyback. I'm not positive about that. And the distinction, let me just be really clear, is that there are a lot of different circumstances in Part D where it's very important that you have a program agreement that covers a particular drug. And so there may be other circumstances where, you know, even if Cervier were not manufacturing Tipsovo, it would be important that the Tipsovo that Cervier is selling be covered by a program agreement. And at least for those purposes, CMS is willing to let the acquiring manufacturer piggyback on the old manufacturer's agreement until they update their own agreement. Is this a fair answer to Judge Millett's question, which is you're not saying that there was piggybacking here. What you are saying is that the rationale of the alternative holding would foreclose piggybacking in other circumstances where you want it to be allowed? It's correct, I think, both with respect to this very particular application of determining specified small manufacturers, but also with respect to, again, sort of Part D generally, where the ability to piggyback comes up. My understanding came up with it. I get the concern. I guess I'm not entirely sure why this whole piggybacking thing is consistent with the statute. So my understanding, Your Honor, is that there is a statutory requirement that the drug has to be covered by an agreement of the manufacturer for the year, for that year. So my understanding is that that is CMS's longstanding practice. I mean, Congress is obviously enacting this provision against the backdrop of that longstanding practice. I think if we were sort of forced to argue about how to interpret the statute, we would rely quite heavily on that preexisting practice. We're going to assume Congress understands what this piggybacking thing is when I don't? Are we struggling with it? I mean, if you can't define it clearly, then we can't assume Congress knew about it. I think Congress certainly understands. I think the court can assume that Congress understands the general concept in this case, or at least intends to not upset CMS's longstanding practices in this area. I think for purposes of this court's review, all the court needs to say is that the government is affirmatively waiving the argument. And I do think that the sort of party participation principles that my friend on the other side discussed are sort of constraining in a way that I think would overcome the usual ability to affirm on grounds sort of not reached by the district court or on other grounds supported by the record. I think in this case, we are telling you we do not think that how CMS interprets and applies the statute is not something that we would defend. It's not something we would apply in the first instance. What case says that we assume Congress is aware of agency longstanding practices at this level of obscurity? I'm not going to be able to say the case for you for that principle. I don't know why we assume Congress legislated against. You guys can try arguing it. You're going to have to have a pretty clear understanding of inconsistent application of piggybacking. And this is a one-year situation here, right? I mean, this was a one-year situation. But just to be like really clear about this, Part D coverage is only available for drugs that are listed on the program agreement. And so my understanding is that like from the beginning or close to the beginning, CMS has permitted this sort of, whether it's attribution of one agreement to another, to the acquired manufacturer, or sort of allowing manufacturers to both be considered to be on the agreement in some sense, to ensure that when you have drugs moving from one manufacturer to another, that there's not a break in the ability to cover those drugs. And that comes up in a number of different contexts, not just in this very specialized context. Again, we'd be happy to provide more briefing on that if the court would like it. I think for this court's purposes, though, all the more we need to say is that if it wants to say anything, the argument has been very affirmatively waived by the government, and prior presentation principles would constrain you from reaching it, notwithstanding that waiver. There are no other questions? I'm not sure we're constrained, but you might have prudential considerations, but anyway. Okay. Any more questions? All right. Thank you. Thank you very much. Okay, Mr. Perdue, we will give you three minutes. Thank you. Sorry, counsel. Thank you, Your Honor. A couple points. First, I'd like to point, Judge Millett, point you to the FDA's National Drug Code regulations. They are cited on page 13 of our opening brief, and they say that the labeler code in the NDC, it can indicate a person who engages in manufacturing, repacking, relabeling, or private label distribution of a drug. So, it doesn't necessarily indicate the manufacturer. Here, it actually indicates the private label distributor. There was a question about whether it's a problem that multiple manufacturers could meet the definition for the same drug or unit. I don't think that's a problem here. That's a feature of the government's reading of the statute. It's a feature of our reading of the statute, too, and it's not a problem for either of us because it's not like there are going to be duplicate discounts here. They're not going to be duplicate discounts here. You're not trying to give discounts for historical transactions that happened back in 2021. You're doing discounts moving forward. I think the most important point I want to leave this court with is that you've got a lot of detailed explanations from the government today from the podium about how they view the statute, and if you put all those explanations side by side with the denial that CMS actually issued on JA 119 and 120, there is a huge disconnect. None of the government's explanations appear in JA 119 and 120. So, I think the easiest path for this court is to simply remand for explanation from the agency. We told them we own the NDA. We are responsible for the manufacturing. That's how this agency administers identical manufacturer definitions in two other statutes. At a minimum, we were entitled to an explanation for why they were using the labeler code as a proxy instead of the NDA. I think you heard from the government today a number of times that labeler code is at best a proxy or a first cut. They acknowledge the possibility that it could be something else, that another entity could be the one that actually meets the statutory definition. Because they've already explained that, yes, but that doesn't matter in this case because as they read the definition of manufacturer, you didn't know it. But CMS certainly did not say that. I mean, CMS certainly did not say that in the denial that they gave us at JA 119 and 120. So, I think at a minimum, under Chenery, this court is trying to... If we think that we can and should resolve all of the legal questions and we do so against you, what's left of the arbitrary and capricious? It seems like a lot of those points are downstream from the legal dispute. So, I think there's the possibility of when they have to give an explanation of them seeing the light as we see it. I think there's also, there was a procedural problem. Assume you lose on your contrary to law. I understand, but... What's left to be remanded. So, there's the possibility. If there has to be, if they're going to use some kind of proxy for the manufacturer, they could use labeler code, but NDA is another possibility and they have to decide which one of those makes sense. I think beyond that, though, I do want to make clear, there's a procedural problem here as to why we didn't put in more evidence at the time. At the time, the government told us, the CMS told us they were not open to considering the very information that they are now faulting us for not providing. So, that's in the guidance at JA 55. They said that they would consider three things, Medicare Part B claims data, Part D PDE data, and ownership information submitted by manufacturers. That's it. So, in our recalculation request, we put ownership information front and center. Then they came back into denial and said, actually, even that additional ownership information that you gave us, it goes beyond the guidance, it goes beyond the methodology, so we're not going to consider it. They then said the same thing to Pharma Centro when they put in additional evidence that went beyond the PDE data. So, now, here in litigation, they're saying, actually, the problem was you didn't give us a different kind of information, information about specific activities that you took with respect to specific TPSOVO units. If they had told us at the time that they were open to considering that kind of evidence, we could have put it in front of them at the time. And if we are given an opportunity, if there's any kind of remand to the agency, we'll put that before them and they can evaluate it. Great. Thank you very much, counsel. To both counsel, the case is submitted. Thank you.
judges: Millett; Katsas; Childs